No. 24-12773

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

WILLIAM DRUMMOND and RICHARD ODOM, individually and
on behalf of all others similarly situated,

*Plaintiffs-Appellants*,

v.

SOUTHERN COMPANY SERVICES, INC.; THE SOUTHERN
COMPANY PENSION PLAN; and THE BENEFITS
ADMINISTRATION COMMITTEE,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Northern District of Georgia, Gainesville Division
Hon. Steve C. Jones
No. 2:22-CV-00174-SCJ

## OPENING BRIEF OF PLAINTIFFS-APPELLANTS

Michelle C. Yau
Daniel R. Sutter
Cohen Milstein Sellers & Toll, PLLC
1100 New York Ave NW
Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4699

Peter K. Stris
Rachana Pathak
Douglas Geyser
STRIS & MAHER LLP
777 S Figueroa St Ste 3850
Los Angeles, California 90017
Telephone: (213) 995-6800
Facsimile: (213) 261-0299
rpathak@stris.com

*Counsel for Plaintiffs-Appellants*
*(additional counsel listed on inside cover)*

Eleanor Frisch
Cohen Milstein Sellers & Toll, PLLC
400 South 4th Street #401-29
Minneapolis, MN 55415
Telephone:  (202) 408-4600

John T. Sparks, Sr.
Austin & Sparks, PC
Post Office Box 888233
Atlanta, GA 30356
Telephone:  (404) 869-0100

### CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE AGREEMENT

Pursuant to Federal Rules of Procedure 26.1 and Eleventh Circuit Rules 26.1-1 *et seq.*, counsel for Plaintiffs-Appellants certify that the following list contains all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party.

1.  Austin & Sparks, P.C. – Counsel for Appellants

2.  Burnette, Jason T. – Counsel for Appellees

3.  Cohen Milstein Sellers & Toll PLLC – Counsel for Appellants

4.  Drummond, William – Appellant

5.  Feinberg, Jackson, Worthman & Wasow, LLP – Counsel for Appellants

6.  Frisch, Eleanor E. – Counsel for Appellants

7.  Geyser, Douglas – Counsel for Appellants

8.  Heintz, Ashely – Counsel for Appellees

9.  Heron, John, IV – Counsel for Appellees

10. Jackson, Todd – Counsel for Appellants

11. Jones, Hon., Steve C. – United States District Judge

12. Jones Day – Counsel for Appellees

13. Martin, Shaun P. – Counsel for Appellants

14. Odom, Richard – Appellant

15. Pathak, Rachana – Counsel for Appellants

16. Southern Company, NYSE: SO – Parent Corporation of Southern Company Services, Inc.

17. Southern Company Services, Inc. – Appellee

18. Sparks, John Thomas, Sr. – Counsel for Appellants

19. Stokes, John – Counsel for Appellants

20. Story, Hon. Richard W. – United States District Judge

21. Stris, Peter K. – Counsel for Appellants

22. Stris & Maher LLP – Counsel for Appellants

23. Sutter, Daniel R. – Counsel for Appellants

24. The Benefits Administration Committee – Appellee

25. The Southern Company Pension Plan – Appellee

26. Wasow, Nina – Counsel for Appellants

27. Yau, Michelle C. – Counsel for Appellants

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellants William Drummond and Richard Odom request oral argument because this appeal raises complex issues of statutory interpretation, the resolution of which will benefit from the appearance of counsel at oral argument.

"[T]o ensure a stream of income to surviving spouses [of pensioners]," *Boggs v. Boggs*, 520 U.S. 833, 843 (1997), the Employee Retirement Income Security Act of 1974 (ERISA) entitles every married participant to a "qualified joint and survivor annuity" ("QJSA") and a "qualified preretirement survivor annuity" ("QPSA"). 29 U.S.C. § 1055. A QJSA provides a monthly pension payment for the life of the participant and their surviving spouse. A QPSA allows a surviving spouse to receive a monthly pension payment even if the participant dies before retirement. Under ERISA, participants' QJSAs must be the "actuarial equivalent" of their single life annuities ("SLAs"), and any charge for the cost of providing QPSAs must be reasonable. Plaintiffs brought this suit because Defendants are violating ERISA by providing QJSAs that are less valuable than SLAs and imposing unreasonably high charges for QPSAs. The court below held that plan sponsors and fiduciaries are allowed to calculate QJSAs and charge for QPSAs in any manner they want—as long as it is written down in plan documents. This flouts the text and purpose of § 1055. Plaintiffs-Appellants respectfully submit that oral argument is warranted in this case.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS.............................................. CIP - 1

STATEMENT REGARDING ORAL ARGUMENT..................................................i

TABLE OF CONTENTS ........................................................................ ii

TABLE OF CITATIONS........................................................................iv

INTRODUCTION ................................................................................1

JURISDICTIONAL STATEMENT ............................................................4

STATEMENT OF THE ISSUES ..............................................................5

STATEMENT OF THE CASE...................................................................6

I.      Statutory Background ........................................................................6

II.     Factual Background ........................................................................13

III.    Procedural History .........................................................................15

IV.     Standard of Review.........................................................................18

SUMMARY OF THE ARGUMENT ......................................................19

ARGUMENT ...................................................................................23

I.      Using outdated mortality assumptions to calculate JSAs causes them to have a lower total value than SLAs and thus violates § 1055(d). .................23

A.    ERISA requires a joint and survivor annuity to have at least the same present value as the participant's single life annuity.................25

B.    ERISA does not allow Defendants to use outdated assumptions when converting single life annuities to joint and survivor annuities...........................................................................................27

    1.    The plain meaning of § 1055(d) demands current assumptions about the present value of participants' single life annuities. ...............................................................................28

    2.    Other ordinary statutory interpretation principles confirm that § 1055(d) obligates Defendants to use current assumptions when converting participants' SLAs to JSAs. ...................................................................................31

    3.    The district court's holding guts the central purpose of § 1055.......................................................................................40

II.    Using outdated mortality assumptions to calculate a JSA violates ERISA's nonforfeiture provision because reducing the total value of the benefit to which a participant is entitled constitutes a forfeiture. .................43

III.   Using outdated mortality assumptions also violates ERISA by overinflating the QPSA charge. ....................................................48

iii

CONCLUSION .................................................................................53

## TABLE OF CITATIONS

**Page(s)**

**Cases**

*Adams v. U.S. Bancorp*,
635 F. Supp. 3d 742 (D. Minn. 2022) ....................................28, 29, 38

*Alessi v. Raybestos-Manhattan, Inc.*,
451 U.S. 504 (1981) ..................................................7, 22, 46, 47

*Baker v. City of Madison*,
67 F.4th 1268 (11th Cir. 2023) .........................................18

*Belknap v. Partners Healthcare Sys., Inc.*,
588 F. Supp. 3d 161 (D. Mass. 2022) ..................................43

*\*Boggs v. Boggs*,
520 U.S. 833 (1997)......................... 1, 3, 8, 21, 27, 41, 52

*Children's Hosp. Ass'n of Tex. v. Azar*,
933 F.3d 764 (D.C. Cir. 2019) ..........................................36

*City of Columbus v. Ours Garage & Wrecker Serv., Inc.*,
536 U.S. 424 (2002) .......................................................36

*Clay v. United States*,
537 U.S. 522 (2003) .......................................................36

*Contilli v. Local 705 Int'l Brotherhood Teamsters Pension Fund*,
559 F.3d 720 (7th Cir. 2009) ..............................22, 45, 46

*Cruz v. Raytheon Co.*,
435 F. Supp. 3d 350 (D. Mass. 2020) ...............................3, 42

*Duffy v. Anheuser-Busch Companies, LLC*,
449 F. Supp. 3d 882 (E.D. Mo. 2020) ...............................2, 42

*Duncan v. Walker*,
533 U.S. 167 (2001) .......................................................32

*Esden v. Bank of Bos.*,
229 F.3d 154 (2d Cir. 2000) ................................................................7, 33, 47, 48

*Franklin v. Duke Univ.*,
No. 1:23-CV-833, 2024 WL 1740479 (M.D.N.C. Apr. 23, 2024)................2, 42

*In re Gateway Radiology Consultants, P.A.*,
983 F.3d 1239 (11th Cir. 2020) ..........................................................................36

*Hamrick v. E.I. du Pont de Nemours & Co.*,
Nos. 23-238-JLH, No. 23-271-JLH, 2024 WL 359240 (D. Del. Jan.
31, 2024), *report and recommendation adopted*, 2024 WL
2817966 (D. Del. June 3, 2024)...................................................................2, 42

*Henry Ford Health Sys. v. Dep't of Health & Hum. Servs.*,
654 F.3d 660 (6th Cir. 2011) ..............................................................................36

*Herndon v. Huntington Ingalls Indus., Inc.*,
No. 4:19-CV-52, 2020 WL 3053465 (E.D. Va. Feb. 20, 2020) .....................2, 42

*Hope v. Acorn Fin. Inc.*,
731 F.3d 1189 (11th Cir. 2013) ..........................................................................36

*Johnson v. City of Shelby, Miss.*,
574 U.S. 10 (2014)...............................................................................................30

*Lasche v. George W. Lasche Basic Profit Sharing Plan*,
111 F.3d 863 (11th Cir. 1997) ..............................................................................8

*Laurent v. PricewaterhouseCoopers LLP*,
794 F.3d 272 (2d Cir. 2015) ...............................................................................33

*Lockheed Corp. v. Spink*,
517 U.S. 882 (1996)..........................................................................................1, 7

*Lyons v. Georgia-Pac. Corp. Salaried Emps. Ret. Plan*,
221 F.3d 1235 (11th Cir. 2000) ............................................................................7

*Masten v. Metro. Life Ins. Co.*,
543 F. Supp. 3d 25 (S.D.N.Y. 2021) .....................................2, 21, 33, 42, 43, 46

*Paieri v. W. Conference of Teamsters Pension Tr.*,
  No. 2:23-cv-00922-LK, 2024 WL 3455269 (W.D. Wash. June 21,
  2024) ................................................................................................2, 42

*Pledger v. Lynch*,
  5 F.4th 511 (4th Cir. 2021) ...................................................................51

*Price Waterhouse v. Hopkins*,
  490 U.S. 228 (1989)................................................................................33

*Reichert v. Bakery, Confectionary, Tobacco Workers & Grain Millers
  Pension Committee*,
  No. 2:23-cv-12343 (E.D. Mich. Apr. 17, 2024), ECF No. 36,
  *appeal filed*, *Reichert v. Kellogg Co.*, No. 24-1442 (6th Cir.) ...........................43

*Russello v. United States*,
  464 U.S. 16 (1983)............................................................................36, 37

*Scott v. AT&T Inc.*,
  No. 20-CV-07094-JD, 2022 WL 2342645 (N.D. Cal. June 29,
  2022) ...................................................................................................3, 42

*Shields v. Reader's Dig. Ass'n, Inc.*,
  331 F.3d 536 (6th Cir. 2003) ...................................................................9

*Smith v. Rockwell Automation, Inc.*,
  438 F. Supp. 3d 912 (E.D. Wis. 2020) .............................................3, 37, 39, 42

*Stephens v. U.S. Airways Grp., Inc.*,
  644 F.3d 437 (D.C. Cir. 2011)..........................................................11, 25

*Tarrant Regional Water Dist. v. Herrmann*,
  569 U.S. 614 (2013)................................................................................36

*Torres v. Am. Airlines, Inc.*,
  416 F. Supp. 3d 640 (N.D. Tex. 2019) ..........................................3, 42, 46

*TRW Inc. v. Andrews*,
  534 U.S. 19 (2001)..................................................................................32

*United States v. Bryant*,
  996 F.3d 1243 (11th Cir. 2014) ............................................................28

*United States v. Councilman*,
    418 F.3d 67 (1st Cir. 2005) .............................................................36, 37

*United States v. Menasche*,
    348 U.S. 528 (1955) ...................................................................................37

*Urlaub v. CITGO Petro. Corp.*,
    No. 21 C 4133, 2022 WL 523129 (N.D. Ill. Feb. 22, 2022) ........2, 20, 32, 41, 42

*Williamson v. Travelport, LP*,
    953 F.3d 1278 (11th Cir. 2020) .........................................................18

**Statutes**

26 U.S.C. § 401 ...........................................................................................8, 39

26 U.S.C. § 411 ................................................................................................7

26 U.S.C. § 417 ...............................................................................8, 10, 12, 50

29 U.S.C. § 1001 ..............................................................................................6

29 U.S.C. § 1001b .............................................................................................6

29 U.S.C. § 1002 ..................................................................................7, 39, 44

*29 U.S.C. § 1053 ...........................................................................................44

29 U.S.C. § 1055(a), (b) ....................................................................................8

29 U.S.C. § 1055(c) .....................................................................................8, 40

*29 U.S.C. § 1055(d) ........................................... 1, 9, 10, 11, 19, 24, 25, 32

29 U.S.C. § 1055(e) .......................................................................................12

29 U.S.C. § 1055(g) ...................................................................................35, 38

29 U.S.C. § 1055(h) .......................................................................................12

*29 U.S.C. § 1055(i) ..............................................................3, 12, 22, 49, 50

29 U.S.C. § 1085a .....................................................................................35, 38

29 U.S.C. § 1202 ..................................................................................8, 46, 48

29 U.S.C. § 1393 ..................................................................................38

**Regulations**

26 C.F.R. § 1.401(a)-11 ..................................................................10, 34

*26 C.F.R. § 1.401(a)-20 ........................................ 10, 12, 22, 23, 49, 50

26 C.F.R. § 1.411(a)-4 ..........................................................8, 46, 48, 49

**Other Authorities**

Cooperative and Small Employer Charity Pension Flexibility Act,
    Pub. L. No. 113-97 (2014), Sec. 102, 128 Stat. 1101.........................39

Employee Retirement Income Security Act of 1974, Pub. L. No. 93-
    406, Sec. 205(g)(3), 88 Stat. 829 ........................................................38

Multiemployer Pension Plan Amendments Act of 1980, Pub. L. No.
    96-364, Sec. 104, 94 Stat. 1208 ..........................................................39

Pension Protection Act of 2006, Pub. L. No. 109-280, Secs. 202 &
    302, 120 Stat. 780 ................................................................................38

42 Fed. Reg. 1463-02, 1466 (Jan. 7, 1977)..............................................34

Actuarial Standards Bd., Actuarial Standard of Practice No. 1 ................29

Actuarial Standards Bd., Actuarial Standard of Practice No. 35.............29

Jeff L. Schwartzmann & Ralph Garfield, Education & Examination
    Comm. of the Soc'y of Actuaries, Actuarially Equivalent Benefits,
    EA1-24-91 (1991)................................................................11, 25, 29

S. Rep. 93-383, available at 1974 U.S.C.C.A.N. 4889 (1973).........10, 41

## INTRODUCTION

ERISA is a landmark statute enacted to protect American workers. "[W]hen Congress enacted ERISA it 'wanted to . . . mak[e] sure that if a worker has been promised a defined pension benefit upon retirement . . . he actually will receive it.'" *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996) (citation omitted).

A standard defined benefit is a single life annuity ("SLA")—a fixed monthly payment, which is typically based on the participant's salary and years of service. It begins at retirement and lasts for the life of the participant. But an SLA leaves an employee's spouse with no protection after the participant dies. So "to ensure a stream of income to surviving spouses," *Boggs v. Boggs*, 520 U.S. 833, 843 (1997), ERISA mandates that plans provide a different default option for married participants—called a qualified joint and survivor annuity ("QJSA").

To ensure that married participants are not treated worse than their unmarried peers, ERISA requires a participant's QJSA to be at least "the actuarial equivalent" of their SLA. 29 U.S.C. § 1055(d)(1)(B). That means the QJSA must have at least the same aggregate value as the participant's SLA. Because an SLA is paid over a participant's lifetime, its aggregate value (its present value) is necessarily determined by current mortality assumptions.

This lawsuit was filed because Defendants are calculating participants' QJSA payments using mortality assumptions that are as much as *seventy years* old.

1

Because people live longer now, the use of outdated actuarial assumptions reduces the value of participants' QJSAs relative to what the use of current mortality tables would have produced. As a result, JSAs have a lower aggregate value than SLAs and married participants do not receive "the actuarial equivalent" of their SLAs.

Notwithstanding those allegations, the district court dismissed Plaintiffs' lawsuit for failure to state a claim. In the court's view, ERISA imposes no restriction whatsoever on the actuarial assumptions that plan sponsors and fiduciaries may use in calculating QJSAs.

That holding is every bit as backwards as it sounds. It flies in the face of both the plain text and obvious purpose of the statutory provisions at issue. And it conflicts with the conclusion of virtually every other court to have taken up the issue. *See, e.g.*, *Paieri v. W. Conference of Teamsters Pension Tr.*, No. 2:23-cv-00922-LK, 2024 WL 3455269, at *10 (W.D. Wash. June 21, 2024); *Franklin v. Duke Univ.*, No. 1:23-CV-833, 2024 WL 1740479, at *3 (M.D.N.C. Apr. 23, 2024); *Hamrick v. E.I. du Pont de Nemours & Co.*, Nos. 23-238-JLH, No. 23-271-JLH, 2024 WL 359240, at *4 (D. Del. Jan. 31, 2024), *report and recommendation adopted*, 2024 WL 2817966 (D. Del. June 3, 2024); *Urlaub v. CITGO Petro. Corp.*, No. 21 C 4133, 2022 WL 523129, at *6-7 (N.D. Ill. Feb. 22, 2022); *Masten v. Metro. Life Ins. Co.*, 543 F. Supp. 3d 25, 33-36 (S.D.N.Y. 2021); *Duffy v. Anheuser-Busch Companies, LLC*, 449 F. Supp. 3d 882, 887-92 (E.D. Mo. 2020); *Herndon v. Huntington Ingalls*

*Indus., Inc.*, No. 4:19-CV-52, 2020 WL 3053465, at *2 (E.D. Va. Feb. 20, 2020); *Cruz v. Raytheon Co.*, 435 F. Supp. 3d 350, 352-53 (D. Mass. 2020); *Smith v. Rockwell Automation, Inc.*, 438 F. Supp. 3d 912, 915-16 (E.D. Wis. 2020); *see also Scott v. AT&T Inc.*, No. 20-CV-07094-JD, 2022 WL 2342645, at *1 (N.D. Cal. June 29, 2022); *Torres v. Am. Airlines, Inc.*, 416 F. Supp. 3d 640, 649-50 (N.D. Tex. 2019).

Just as flawed is the district court's dismissal of Plaintiffs' claim based on Defendants' charges for participants' qualified preretirement survivor annuities ("QPSAs"). A QPSA is a monthly benefit that is paid to the surviving spouse of a participant who died before retirement. *See Boggs*, 520 U.S. at 843 ("Section 1055 mandates a survivor's annuity not only where a participant dies after the annuity starting date but also guarantees one if the participant dies before then."). ERISA allows plans to impose a QPSA charge, but it caps the amount at "the increased costs resulting from providing" the QPSA (29 U.S.C. § 1055(i)), and Treasury regulations specify that the charge must be "reasonable" or else it will constitute a forfeiture in violation of § 1053(a). Despite the statute and regulations, the district court nevertheless held that Defendants can charge whatever they want, again with no limits whatsoever. There is no basis in law or logic for that conclusion.

Reversal is warranted.

3

**JURISDICTIONAL STATEMENT**

The district court had subject-matter jurisdiction under 29 U.S.C. § 1132(e) and 28 U.S.C. § 1331 because Plaintiffs-Appellants asserted claims created by a federal statute, ERISA. This Court has appellate jurisdiction under 28 U.S.C. § 1291. The district court dismissed all claims and entered final judgment in favor of Defendants-Appellees on July 30, 2024. Doc. 62, Doc. 63.[1] Plaintiffs-Appellants filed a timely notice of appeal on August 27, 2024. Doc. 64; Fed. R. App. P. 4(a)(1)(A).

---

[1] District court docket entries are cited by document number and ECF page number.

## STATEMENT OF THE ISSUES

1.    Did the district court err in holding that 29 U.S.C. § 1055 allows Defendants to calculate "the actuarial equivalent of a single annuity for the life of the participant" in any manner they choose—even if they use outdated mortality data that results in joint and survivor benefits that are worth less than participants' single life annuities?

2.    Did the district court err in holding that Odom failed to state a claim for violation of ERISA's nonforfeiture provision, 29 U.S.C. § 1053(a), where Odom plausibly alleged that his Plan entitled him to a certain normal retirement benefit (his single life annuity), but that he received a less valuable benefit due to Defendants' use of outdated actuarial assumptions in calculating his JSA?

3.    Did the district court err in holding that Odom and Drummond failed to state a claim for violation of § 1053(a) and/or § 1055(i) where Plaintiffs plausibly alleged that Defendants imposed an unreasonably high charge for their QPSAs?

## STATEMENT OF THE CASE

Plaintiffs William Drummond and Richard Odom, and the classes they sought to represent in this lawsuit, are vested participants and/or beneficiaries in the Southern Company Pension Plan ("Plan"). Plaintiffs brought this lawsuit to redress the systematic underpayment of pension benefits to married participants and the surviving spouses of deceased participants.

## I.    Statutory Background

A.    Congress enacted ERISA "to protect . . . the interests of participants in employee benefit plans and their beneficiaries," and to safeguard their rights with "appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C. § 1001(b). As its name plainly states, ERISA seeks to ensure that workers can enjoy financial security in retirement. 29 U.S.C. § 1001b(c) ("It is hereby declared to be the policy of this title---. . . (2) to encourage the maintenance and growth of single-employer defined benefit pension plans; (3) to increase the likelihood that participants and beneficiaries under single-employer defined benefit pension plans will receive their full benefits; . . . ."). It regulates private pension plans, which are employee benefit plans "established or maintained by an employer or by an

6

employee organization" that "provide[] retirement income to employees." 29 U.S.C. § 1002(2)(A)(i).[2]

When Congress passed ERISA, it was particularly concerned with the protection of traditional pension benefits: "[W]hen Congress enacted ERISA it 'wanted to . . . mak[e] sure that if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it.'" *Lockheed*, 517 U.S. at 887. "Employers do not have to provide pension plans, but when they do, those plans must comply with Title I of ERISA." *Esden v. Bank of Bos.*, 229 F.3d 154, 172 (2d Cir. 2000).

B.    One of ERISA's "most critical[]" protections is against the forfeiture of vested benefits. *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 510 (1981). "ERISA establishes that '[e]ach pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age.'" *Id*. at 510-11 (quoting 29 U.S.C. § 1053(a)); *see also* 26 U.S.C.

---

[2] Private pension plans fall into two categories: "defined contribution" plans, *e.g.*, a 401(k) plan, or "defined benefit" plans. 29 U.S.C. § 1002(35), (34). A defined benefit plan is a traditional pension plan, where the employer (plan sponsor) promises a fixed amount, paid regularly and lasting for the employee's lifetime. *Lyons v. Georgia-Pac. Corp. Salaried Emps. Ret. Plan*, 221 F.3d 1235, 1237 (11th Cir. 2000).

§ 411(a).[3] Treasury regulations implement ERISA's anti-forfeiture requirements, *see* 29 U.S.C. § 1202(c), and they make clear that "adjustments to plan benefits such as adjustments in excess of reasonable actuarial reductions," can run afoul of § 1053. *See* 26 C.F.R. § 1.411(a)-4(a).

A standard protected benefit is a single life annuity, which is a fixed monthly payment, usually based on the participant's salary and years of service. It begins at retirement and lasts for the life of the participant.

C.    For married participants, ERISA requires plans to provide a "qualified joint and survivor annuity" (QJSA) and a "qualified preretirement survivor annuity" (QPSA) as defaults. 29 U.S.C. § 1055(a)(1), (b)(1)(A); *see also* 26 U.S.C. § 401(a)(11). Whereas a single life annuity leaves an employee's spouse with no protection after the participant dies, the QJSA and QPSA both protect the spouse. The QJSA continues to pay the spouse if the participant dies during retirement, and the QPSA pays the spouse if the participant dies before retirement. *Boggs*, 520 U.S. at 843 ("Section 1055 mandates a survivor's annuity not only where a participant dies after the annuity starting date but also guarantees one if the participant dies before then."). Married participants cannot opt out of these defaults unless the participant and their spouse both agree in writing. 29 U.S.C. § 1055(c)(2); *Lasche v.*

---

[3] Parallel provisions in the Internal Revenue Code ("I.R.C.") make clear that the obligations set forth in ERISA are also necessary for defined benefit plans to maintain their tax-qualified status. *See, e.g.*, 26 U.S.C. §§ 401, 417.

*George W. Lasche Basic Profit Sharing Plan*, 111 F.3d 863, 867 (11th Cir. 1997) ("[A]ny waiver of retirements benefits by a spouse must strictly comply with the consent requirements set forth in ERISA.").

1.      Qualified Joint and Survivor Annuities

Any joint and survivor annuity has two parts: First, starting at the participant's retirement, the plan pays an annuity (a fixed monthly payment) during the "joint" lives of the participant and their spouse. Second, after the participant's death, the plan then pays a "survivor annuity" (a fixed monthly payment) to the participant's spouse for the remainder of the spouse's life. The survivor annuity of QJSAs can range anywhere from 50% to 100% of the amount paid during the couple's joint lives, *see* 29 U.S.C. § 1055(d)(1)(A), but typical survivor annuities are 50%, 75%, or 100% of the monthly payment during the "joint" period.

2.      Actuarial Equivalence

Since all joint and survivor annuities are payable over the course of two lives, the monthly payments are typically less than the monthly payments the plan makes to a participant receiving a single life annuity. *Shields v. Reader's Dig. Ass'n, Inc.*, 331 F.3d 536, 539, n.2 (6th Cir. 2003) ("A retiree will typically receive a higher monthly payment under the life annuity option than under either of the joint and survivor options because under the latter options, the payments are likely to continue for a longer period of time because of the survivor benefits component."). To

9

calculate the participant's monthly JSA payment, plans apply a "conversion factor" (*e.g.*, 0.90) to the SLA. The conversion factor is determined by comparing the present value of the SLA to the present value of the JSA, and these present values in turn depend on two actuarial assumptions—a mortality table and an interest rate. The mortality table predicts the length of each annuity, and the interest rate permits each stream of payments to be discounted to its present value. An older mortality table will typically produce a lower conversion factor (assuming the interest rate is held constant). A lower conversion factor yields a lower monthly JSA payment.

Even though it is appropriate for monthly QJSA payments to be lower than monthly SLA payments, ERISA requires QJSAs to be "the actuarial equivalent of a single annuity for the life of the participant." 29 U.S.C. § 1055(d)(1)(B); *see also* 26 U.S.C. §§ 417(b), (g); 26 C.F.R. § 1.401(a)-11(b)(2) ("A qualified joint and survivor annuity must be at least the actuarial equivalent of the normal form of life annuity or, if greater, of any optional form of life annuity offered under the plan."), § 1.401(a)-20 Q&A (16) ("In the case of a married participant, the QJSA must be at least as valuable as any other optional form of benefit payable under the plan at the same time."); S. Rep. 93-383, available at 1974 U.S.C.C.A.N. 4889, 5029 (1973) ("[T]he participant's own annuity may be reduced, so that the value of the joint and survivor annuity and the value of the annuity the participant would have been entitled to receive had the option not been exercised are actuarially equivalent.").

10

ERISA does not provide a statutory definition of "actuarial equivalent." A commonly cited judicial definition is: "Two modes of payment are actuarially equivalent when their present values are equal under a given set of actuarial assumptions." *Stephens v. U.S. Airways Grp., Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011) (citing Jeff L. Schwartzmann & Ralph Garfield, Education & Examination Comm. of the Soc'y of Actuaries, Actuarially Equivalent Benefits, EA1-24-91, at 1 (1991)).

Accordingly, the starting point for the actuarial equivalence calculation is the present value of the "single annuity" that "the participant" will receive. 29 U.S.C. § 1055(d)(1)(B). Then that participant's QJSA must be calculated such that its present value equals that of the participant's SLA.

### 3.    Qualified Preretirement Survivor Annuity

Whereas JSAs (and SLAs) are payable to participants when they retire, a QPSA provides a death benefit to the surviving spouse of a participant who died before retirement. Section 1055(e) defines "'qualified preretirement survivor annuity' [as] a survivor annuity for the life of the surviving spouse of the participant," which (in most circumstances) is (1) "not less than the amounts which would be payable as a survivor annuity under the qualified joint and survivor annuity under the plan (or the actuarial equivalent thereof)" and (2) available in the month when the deceased "participant would have attained the earliest retirement age under

11

the plan." 29 U.S.C. § 1055(e); *see also* 26 U.S.C. § 417(c). "[E]arliest retirement age means the earliest date on which, under the plan, the participant could elect to receive retirement benefits." 29 U.S.C. § 1055(h). In other words, if a participant dies before retirement, the QPSA entitles their surviving spouse to a monthly payment that is identical to the survivor annuity of at least one of the plan's QJSAs. And since the monthly payments of QPSAs are pegged to the monthly survivor payments of QJSAs, the actuarial equivalence requirement in 29 U.S.C. § 1055(d)(1)(B) affects QPSAs as well.

### 4. The "Cost" of QJSAs and QPSAs

While ERISA requires pension plans to offer QJSAs and QPSAs to married participants, it does allow them to "take into account in any equitable manner (as determined by the Secretary of the Treasury) any increased costs resulting from providing a qualified joint or survivor annuity or a qualified preretirement survivor annuity." 29 U.S.C. § 1055(i). As Congress decreed, the Secretary of Treasury has offered specific guidance about whether "a defined benefit plan [may] charge the participant for the cost of the QPSA benefit." 26 C.F.R. § 1.401(a)-20. A charge may be imposed after the participant has been notified of their ability to waive the QPSA, and the charge must "reasonably reflect[] the cost of providing the QPSA." *Id.* ("A charge for the QPSA that reasonably reflects the cost of providing the QPSA will not

fail to satisfy section 411 [the I.R.C. provision on nonforfeiture that parallels § 1053] even if it reduces the accrued benefit.").

## II.    Factual Background

Plaintiffs Richard Odom and William Drummond are participants in the Southern Company Pension Plan, which has more than 56,000 participants and $16 billion in assets. Doc. 51 at 11 (¶ 21). The Plan's sponsor is Defendant Southern Company Services, Inc. ("Southern"), one of America's largest utility companies. *Id*. at 10-11 (¶ 20). The Plan's administrator and named fiduciary is the Benefits Administration Committee (the "Committee"), also a defendant in this case. *Id*. at 11, 37-38 (¶¶ 22, 98).

Participants in the Plan accrue benefits in the form of a single life annuity. Doc. 51 at 17 (¶ 38); *see, e.g.*, Doc. 53-8 at 11 ("Accrued Benefit means the Retirement Income benefit described in Section 4.2(a) or (b), as applicable") and Doc. 53-8 at 43-44 (§ 4.2). In other words, the normal retirement benefit under the Plan is an SLA. Doc. 51 at 17 (¶ 38). The single life annuity is also the default form of payment for unmarried participants. *Id*. at 3, 17 (¶¶ 4, 38). The default form of payment for married participants, on the other hand, is a 50% joint and survivor annuity, though married participants may elect a 75% or 100% joint and survivor annuities without spousal consent. *Id*. at 3, 17 (¶¶ 5, 39-40). Odom receives a 50% JSA, and Drummond receives a 100% JSA. *Id*. at 8, 9 (¶ 18, ¶ 19).

In addition to receiving a QJSA as a default, married participants are, by default, entitled to receive a qualified preretirement survivor annuity. Doc. 51 at 31-32 (¶ 79). The QPSA is a death benefit: it provides a life annuity to the surviving spouse of a Plan participant who dies before retirement. *Id*. at 32 (¶ 79). The QPSA can be waived only with written consent from the participant and their spouse. *Id*. at 31-32 (¶ 79). Neither Plaintiff waived his QPSA. *Id*. at 32 (¶ 79).

While most plans do not charge participants for the QPSA benefit, the Southern Plan does. Doc. 51 at 33 (¶¶ 83-84). Defendants impose the charge for every year that the participant is covered by the QPSA. For example, the charge for Drummond's QPSA was 0.875%, it was applied from age 50 until his retirement fifteen years later, and it resulted in a 0.86875 reduction of his single life annuity. *Id*. at 33-34 (¶ 86). Odom's QPSA charge was 0.75%, and it resulted in application of a 0.89563 reduction of his single life annuity. *Id*. at 34-35 (¶ 89). Plaintiffs allege Drummond's QPSA charge was calculated using a 5% discount rate and mortality assumptions from the 1951 Group Annuity Mortality Table (1951-GAM). *Id*. at 34 (¶ 86). Plaintiffs allege Odom's charge was also calculated using outdated actuarial assumptions. *Id*. at 35 (¶ 89).

In addition to using actuarial assumptions to determine the QPSA charge, Defendants used actuarial assumptions when converting Plaintiffs' SLAs (reduced by the QPSA charge) to JSAs. Doc. 51 at 1-4 (¶¶ 1-7). In other words, Defendants

first applied the QPSA charge to Plaintiffs' single life annuities, and next converted those reduced single life annuity payments to joint and survivor annuity payments. *Id*. at 4 (¶ 7). When converting the reduced SLAs to JSAs, Defendants again utilized actuarial assumptions that Plaintiffs allege are wildly outdated. For many participants, such as Drummond, Defendants applied a five percent interest rate and mortality assumptions from the 1951 GAM for males. *Id*. at 22 (¶ 53). The 1951-GAM was created by studying life expectancies during the years 1946 to 1950 among persons at or near retirement age. In other words, when converting SLAs to JSAs, Defendants used mortality data for men born in the late 1800s. *Id*. at 20 (¶ 48). For other participants, such as Odom, Defendants applied specifically identified factors, *e.g.*, 0.95, rather than a specifically identified discount rate and mortality table. *Id*. at 24-25 (¶ 60). Plaintiffs allege these factors are based on outdated actuarial assumptions, and the factor applied to convert Odom's reduced SLA to a 50% JSA yielded a monthly payment that was even lower than it would have been if it had been calculated using the 1951-GAM. *Id*. at 9-10, 22, 24-25 (¶¶ 19, 53, 60, 62).

## III.  Procedural History

This putative class action challenges Defendants' illegally low QJSA payments and unreasonably high QPSA charges. The suit was filed in September 2022, and the operative complaint (the second amended complaint) asserted four

causes of action against the plan sponsor and fiduciary. Doc. 51 at 16-47 (¶ ¶ 35-119). The Plan is a nominal defendant, joined only to ensure complete relief. *see id*. at 2, 11 (¶ 2, n.2 and ¶ 21).

In Counts I and II, Odom, as representative of a "JSA Class," challenged Defendants' conversions of SLAs to JSAs. Odom worked for Alabama Power as a field technician, and he retired when he was 65. Doc. 51 at 9 (¶ 19). Odom's 50% JSA (which is supposed to be a QJSA) commenced on or around April 1, 2018. *Id*. at 9 (¶ 19). Were Odom single, rather than married, his default benefit would have been a single life annuity of $3588.65/month. His 50% JSA, however, is only $2899.12/month. *Id*. at 24-25 (¶ 60). Had Defendants used current actuarial assumptions, rather than outdated ones, to convert Odom's SLA to a 50% JSA, his monthly JSA payments would be higher. *Id*. at 25, 29 (¶¶ 61, 74). Odom's 50% JSA has a lower present value than the present value of his SLA, either reduced or unreduced by the QPSA charge. *See id*. at 24-26, 29-30 (¶¶ 60, 61, 64, 72-74). As a result, Odom's 50% JSA is not the actuarial equivalent of his single life annuity, and Defendants violate both § 1055(d) (Count I) and § 1053 (Count II).

In Count III, Odom and Drummond, as representatives of the "QPSA Class," challenged Defendants' unreasonably high QPSA charges. Doc. 51 at 31-37 (¶¶ 79-97). Defendants significantly overestimated the probability that participants would die in any given year and thus significantly overestimated the likelihood that

they would need to provide a death benefit to the participants' surviving spouses. *Id*. at 34, 35 (¶¶ 87, 90). Had Defendants used current actuarial assumptions to accurately estimate the cost of providing QPSAs to married participants, they would have charged Drummond 0.3% per year (rather than 0.875%) and Odom 0.6% per year (rather than 0.75%). *Id*. at 33-34, 35 (¶¶ 86-87, 89-90).

In Count IV, Odom, as representative of the JSA and QPSA Classes, and Drummond, as representative of the QPSA Class, alleged breach of fiduciary duty against the Benefits Administration Committee for their disloyal and imprudent application of illegal plan terms and their misrepresentations to participants and beneficiaries about the values of their JSAs and the costs of their QPSAs. *Id*. at 37-47 (¶¶ 98-119).

Defendants moved to dismiss Plaintiffs' second amended complaint, and the court granted their motion. Doc. 62. The court dismissed Count I because it concluded that "the plain, established meaning of 'actuarial equivalent'" in § 1055(d) does not require JSAs to be calculated "using reasonable actuarial assumptions." *Id*. at 18. Rather, "the only relevant place where 'actuarial equivalence' is defined is in the Plan itself." *Id*. (cleaned up). Because Defendants had calculated JSAs in accordance with the Plan's terms, they had not violated § 1055(d). *Id*. at 18-19. This was also ultimately fatal to Counts II and III, *id*. at 19-21, and the district court rejected the argument that § 1055(i) allows "only those

17

QPSA charges that *reasonably* reflect the cost of providing a QPSA." *Id*. at 20. Finally, because the district court had concluded that there was no violation of § 1055(d) or § 1053, it held there could be no fiduciary breach. *Id*. at 21-22. The court's only basis for dismissing Count IV was that Counts I-III failed. *Id*.

## IV.    Standard of Review

This Court reviews "*de novo* the dismissal of a complaint for failure to state a claim upon which relief can be granted, accepting all factual allegations in the complaint as true and viewing them in the light most favorable to the plaintiff." *Williamson v. Travelport, LP*, 953 F.3d 1278, 1288 (11th Cir. 2020). "To survive a motion to dismiss, a complaint must contain sufficient factual allegations to state a claim for relief that is plausible on its face." *Id*.

On a motion to dismiss, the court may consider pleadings and attached exhibits. *Baker v. City of Madison*, 67 F.4th 1268, 1276 (11th Cir. 2023). While Plan documents may be considered, *see* Doc. 62, n. 11, it is improper to consider outside evidence. Namely, this Court may not consider documents offered by Defendants but to which Plaintiffs have objected. *Baker*, 67 F.4th at 1276.

## SUMMARY OF THE ARGUMENT

**I.** ERISA requires that a married participant's joint and survivor annuity be "the actuarial equivalent of a single annuity for the life of the participant." 29 U.S.C. § 1055(d). The district court misinterpreted § 1055(d) in holding that it allows Defendants to calculate joint and survivor annuities using any actuarial assumptions they wish, including outdated, decades-old mortality tables.

**A.** The basic requirement of § 1055(d) is that the present value of the JSA must be at least equal to the present value of the annuity that the participant would receive if they retired unmarried. Defendants told the district court exactly that. As they put it, "[b]y default, unmarried participants receive their benefits in the form of a SLA." Doc. 53-1 at 9. Then "[t]o determine the amount of the elected JSA, the Plan converts" the SLA into a JSA by "spreading payments for *the same benefit* earned over two lives instead of one." *Id*. at 10 (emphasis added). In other words, the aggregate amount (present value) of the JSA must be at least equal to the aggregate amount (present value) of the participant's SLA.

So one key to satisfying § 1055(d) is correctly calculating the aggregate amount of the SLA—for it is that amount that the JSA must equal (or exceed).

**B.** ERISA's text and purpose make clear that plans may not use outdated actuarial assumptions when converting SLAs to JSAs because outdated assumptions

19

will not accurately yield the amount of the benefit owed to the single, retired participant (the present value of the participant's single life annuity).

The term "actuarial equivalence" demands current assumptions for the obvious reason that Congress did not presume that actuaries act unreasonably (and regardless, it would be bizarre for Congress to authorize unreasonable assumptions in a statute expressly designed to protect participants by curbing plan malfeasance). An actuary calculating the present value of the annuity for an unmarried participant retiring today would not reasonably decide to use decades-old mortality data.

The phrase "for the life of the participant" also forecloses such outdated mortality assumptions. Decades-old assumptions may create an annuity that reasonably estimates *someone's* lifespan, but it is certainly not that of "the participant."

What's more, the district court's interpretation of § 1055(d) makes the actuarial equivalence requirement surplusage. If Defendants can use outdated assumptions when converting SLAs to JSAs, then participants' JSA payments could be a tiny fraction of their SLA payments. Without a reasonableness limit on the actuarial assumptions, "the actuarial equivalence requirement would be rendered meaningless." *Urlaub*, 2022 WL 523129, at *6. The district court's holding thus violates cardinal principles of statutory construction.

The district court rested its conclusion on the fact that Congress did not explicitly write the word "reasonable" into § 1055(d). That omission cannot carry the weight the court thought. The words Congress did write show that it did not authorize Defendants to use any actuarial assumptions they want.

Finally, on top of those textual infirmities, the district court's interpretation frustrates the plain purpose of § 1055. As the Supreme Court explained, this provision aims "to ensure a stream of income to surviving spouses." *Boggs*, 520 U.S. at 843. But by using mortality tables from an era when lifespans were significantly shorter, Defendants offer JSAs that are significantly less valuable than SLAs. That inequality either penalizes married participants or incentivizes them to opt out of the JSA. Either way, participants and their surviving spouses would not receive the stream of income that ERISA guarantees.

**II.** Odom also stated a claim that Defendants' JSA conversion effected a forfeiture of his "right to his normal retirement benefit" in violation of 29 U.S.C. § 1053(a). A participant states a claim under that section by "plausibly alleging that the actuarial assumptions reduced his benefits as compared to the Plan's default benefit." *Masten*, 543 F. Supp. 3d at 36 (cleaned up). Odom plainly did so—he alleged that he had an unconditional right to 100% of his normal retirement benefit, but that Defendants' actuarial assumptions impermissibly left him with a less valuable benefit. Those allegations state a claim under § 1053(a) because "a

21

reduction in the total value of all monthly benefits is a kind of forfeiture." *Contilli v. Local 705 Int'l Brotherhood Teamsters Pension Fund*, 559 F.3d 720, 722 (7th Cir. 2009).

The district court thought that, based on *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504 (1981), there can be no forfeiture so long as the plan terms were followed. But *Alessi* and § 1053(a)'s plain text mean only that plan sponsors are free to choose the *normal retirement benefit*. Once they make that choice, and once the participant vests in that normal retirement benefit (the SLA), § 1053(a) prevents plans from paying a less valuable benefit, even in another form like a JSA.

**III.** The district court also erred in dismissing Plaintiffs' claim based on unreasonable QPSA charges. While ERISA allows a plan to impose a QPSA charge "as determined by the Secretary of the Treasury" (29 U.S.C. § 1055(i)), both sides agreed in the district court that the charge must "'reasonably reflect[] the cost of providing the QPSA.'" Doc. 58 at 14-15 (quoting Doc. 56 at 11, 19). That understanding arises from a controlling Treasury regulation providing: "A charge for the QPSA that reasonably reflects the cost of providing the QPSA will not fail to satisfy section 411 [the corresponding I.R.C. provision on nonforfeiture] even if it reduces the accrued benefit." 26 C.F.R. § 1.401(a)-20 Q/A 21. Plaintiffs plausibly alleged that Defendants' QPSA charges are unreasonably high. That's enough to state a claim for violations of §§ 1055(i) and 1053(a).

22

The district court incorrectly concluded that 26 C.F.R. § 1.401(a)-20 Q/A 21 does not control. Section 1055(i) expressly invokes Treasury guidance, and § 1.401(a)-20 expressly invokes 26 U.S.C. § 417, which contains the identical parallel I.R.C. provision to § 1055(i). Defendants did not even argue below that this regulation does not apply.

The court also somehow read the regulation to permit unreasonable QPSA charges. Again, not even Defendants made that argument, and for good reason. It would be senseless for the regulation to bless "reasonabl[e]" charges if unreasonable charges also pass muster.

In any event, § 1055(i) itself limits QPSA charges to "any increased costs resulting from providing a" QPSA, and Plaintiffs alleged that Defendants' charges exceed those costs. Even without the regulation, therefore, Plaintiffs have stated a claim.

## ARGUMENT

### I. Using outdated mortality assumptions to calculate JSAs causes them to have a lower total value than SLAs and thus violates § 1055(d).

The district court held that, when Defendants convert a participant's single life annuity into a joint and survivor annuity, ERISA allows them to pick any actuarial assumptions they want, no matter how outdated, as long as they are written in the plan document. That holding violates ERISA's plain text and purpose.

Section 1055(d) unambiguously requires plans to provide to a participant a joint and survivor annuity that is at least equal in value to the annuity that the participant would have received if he or she had retired unmarried—the "actuarial *equivalent* of a *single annuity* for the life of *the participant*." 29 U.S.C. § 1055(d) (emphasis added). Defendants do not dispute that. As they put it, the joint and survivor annuity is the "same benefit" as the single life annuity, just "earned over two lives instead of one." Doc. 53-1 at 10; *see id.* at 7. That means that the proper comparator for determining actuarial equivalence is the present value of the participant's single life annuity at or around the time when their benefits began. In other words, to determine actuarial equivalence, one must first ask *to what* must the JSA be equivalent—and the statute clearly answers that it is "the single annuity for the life of the participant." 29 U.S.C. § 1055(d)(1)(B), § 1055(d)(2)(A)(ii).

Once that premise is accepted, the inescapable conclusion is that a plan may not calculate a JSA by using—as the district court approved—a many-decades-old mortality table. This is because that kind of unreasonable assumption will not produce the "same benefit" that the participant would have earned if they retired unmarried; it will instead produce a joint and survivor annuity that has a lower present value than the present value of the participant's single life annuity.

That plainly violates § 1055(d)'s requirement that the joint and survivor annuity be "the actuarial equivalent of a single annuity for the life of the participant."

24

29 U.S.C. § 1055(d)(1)(B), § 1055(d)(2)(A)(ii). Cabining plans' discretion is critical to preventing a plan sponsor's manipulation that could undermine the spousal benefits that ERISA secures. If Defendants are allowed to use unreasonable actuarial assumptions when calculating JSA payments, they can effectively get away with paying participants less than the present value of their SLAs—benefits that ERISA was designed to protect. The court's judgment should be reversed.

## A. ERISA requires a joint and survivor annuity to have at least the same present value as the participant's single life annuity.

There can be no serious dispute that § 1055(d) requires the present value of Odom's joint and survivor annuity to be at least the same as the present value of Odom's single life annuity. The statute provides that a QJSA must be "the actuarial equivalent of a single annuity for the life of the participant." 29 U.S.C. § 1055(d)(1)(B). The "single annuity for the life of the participant" is the ordinary SLA—what the participant would receive if they were not defaulted into a JSA. And "actuarial equivalen[ce]" requires equal present values of the two forms of benefits: "Two modes of payment are actuarially equivalent when their present values are equal under a given set of actuarial assumptions." *Stephens*, 644 F.3d at 440 (citing Schwartzmann & Garfield at 1).

Defendants do not dispute this. As they acknowledged in their motion to dismiss, "[b]y default, unmarried participants receive their benefits in the form of a SLA." Doc. 53-1 at 9. Then "[t]o determine the amount of the elected JSA, the Plan

25

converts" the SLA into a JSA by "spreading payments for the *same benefit* earned over two lives instead of one." Doc. 53-1 at 10 (emphasis added). The Plan does so by "tak[ing] into account life expectancy (to determine the expected duration of benefit payments) and interest rates (to account for the time-value of money)." Doc. 53-1 at 10-11; *see id.* at 7. The Plan defines "actuarial equivalent" the same way, *i.e.*, as "a benefit of *equivalent value*," albeit calculated using certain factors. Doc. 53-3 at 9 (emphasis added); Doc. 53-8 at 11 (emphasis added). While each monthly payment for a JSA is smaller than the monthly payment for the SLA, the total present value of those payments should be the same.

Other aspects of § 1055(d) further make clear that the joint and survivor annuity must equal the present value of the single life annuity the participant would have received as a default if they were unmarried when they retired. "[T]he life of the participant" in § 1055(d) does not refer to some hypothetical person who retired decades ago; it is the person who is retiring now and has built up a certain accrued benefit with their years of service. Defendants cannot rewrite this part of § 1055's actuarial equivalence equation by converting "the participant" into an imaginary person who retired in the 1950s (or 1500s).

Moreover, requiring that the present value of the JSA equals the present value of the participant's SLA is also the only way to fulfill § 1055(d)'s purpose. As detailed in Part I.B.3 below, the statute aims to protect "the economic security of

26

surviving spouses." *Boggs*, 520 U.S. at 843. It is thus essential that a JSA's value equal (at least) that of the SLA. Otherwise, a participant is incentivized to choose the SLA and forgo the "stream of income to [the] surviving spouse[]" (*id.*) that Congress meant to ensure with a JSA.

Accordingly, the key to satisfying § 1055(d) is that Odom's joint and survivor annuity must have a present value that is (at least) equal to the present value of the single life annuity that he would receive as a default if he were single, rather than married: the single life annuity.[4]

## B. ERISA does not allow Defendants to use outdated assumptions when converting single life annuities to joint and survivor annuities.

The problem for Defendants is that they have provided Odom and the JSA class with joint and survivor annuities that are less valuable than what they would expect to receive under their single life annuities.

If Odom and the JSA class were not receiving JSAs, they would receive specified monthly payments for the rest of their lives. The expected aggregate value of those payments can only be accurately determined with a present-value calculation that reflects the conditions that exist when participants retire and

---

[4] Because the QPSA charge here is illegal, the present value of Odom's JSA must be compared to the present value of his unreduced SLA—the benefit that he would receive as a default if he were unmarried. Regardless, Odom's JSA has a lower present value than the present value of his SLA even when reduced by the QPSA charge. Doc. 51 at 25 (¶ 61).

commence benefits. But when Defendants calculate the present value of that income stream (the single life annuity) for purposes of converting it to a joint and survivor annuity, they use mortality assumptions that are decades old. This is an entirely inaccurate estimate of participants' life expectancies. As a result, Defendants underestimate the present values of participants' single life annuities, and their conversions yield JSAs with a lower present value than the participants' SLAs. This is inconsistent with both the text and purpose of § 1055.

### 1. The plain meaning of § 1055(d) demands current assumptions about the present value of participants' single life annuities.

Section 1055(d) requires the joint and survivor annuity to be "the actuarial equivalent of a single annuity for the life of the participant." Under a "commonsense reading of the relevant statutory text" (*United States v. Bryant*, 996 F.3d 1243, 1252 (11th Cir. 2014)), the present value of the "single annuity for the life of the participant" must be determined by current actuarial assumptions, not unreasonable ones that plan sponsors and fiduciaries happen to prefer.

The requirement that reasonable actuarial assumptions must be used to determine the present value of the single life annuity is baked into the concept of an *actuarial* equivalent. *See, e.g.*, *Adams v. U.S. Bancorp*, 635 F. Supp. 3d 742, 751 (D. Minn. 2022) (addressing actuarial equivalence and explaining that "[i]f 'Congress has used technical words or terms of art, it is proper to explain them by reference to

the art or science to which they are appropriate'") (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 201 (1974)).

That term demands sound actuarial judgment, and proper actuarial analysis obviously does not include making unreasonable assumptions. *See, e.g.*, *Adams*, 635 F. Supp. 3d at 751; Actuarial Standards Bd., Actuarial Standard of Practice No. 1, § 2.10 ("In many instances, the ASOPs [Actuarial Standards of Practice] call for the actuary to take 'reasonable' steps, make 'reasonable' inquiries, select 'reasonable' assumptions or methods, or otherwise exercise professional judgment to produce a 'reasonable' result when rendering actuarial services. The intent is to call upon the actuary to exercise the level of care and diligence that, in the actuary's professional judgment, is necessary to complete the assignment in an appropriate manner."); Actuarial Standards Bd., Actuarial Standard of Practice No. 35, § 3.2.5 ("The actuary should select reasonable demographic assumptions."); Schwartzmann & Garfield at 11 ("The interest and mortality assumptions play a key role in determining the magnitude of the actuarial equivalence factor. Periodically, the assumptions used must be reviewed and modified so as to insure that they continue to fairly assess the cost of the optional basis of payment."). In other words, when Congress specified an

"actuarial equivalent," it required an analysis under the reasonable standards of the profession, not just any mathematical equation a plan could concoct.[5]

And, as explained above, the statute calls for equivalence between the JSA and SLA that the real-life participant would have received. Thus, plans must perform an "actuarial equivalent" conversion so that a married participant receives "the same benefit" as an unmarried participant, just "spread[] . . . over two lives instead of one." Doc. 53-1 at 10 (citation omitted). If an actuary were asked to calculate the present value of the benefit that Odom would receive if he retired unmarried, the actuary would select actuarial assumptions—a mortality table and discount rate— that reasonably reflect the conditions that existed at the time Odom retired and commenced benefits.[6]

_____

[5] The district court wrote that "Plaintiffs do not allege that the industry practice is to apply reasonable assumptions to determine actuarial equivalence." Doc. 62 at 18. But the meaning of "actuarial equivalent" is a purely legal question, and Plaintiffs did not need to include their legal theory in their complaint. *See Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) ("Federal pleading rules . . . do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted.") (citation omitted). And Plaintiffs' opposition to the motion to dismiss argued that "plans must choose among 'options that fall within the range of reasonableness at the time of the benefit determination, as determined by professional actuaries'" and that "Congress's decision to require 'actuarial equivalence' has independent force" because it requires "accurate and reasonable" assumptions. Doc. 56 at 15-16.

[6] In response to Defendants' assertion that Odom's JSA was calculated using a 2014 mortality table, Plaintiffs objected to the introduction of evidence extrinsic to the pleadings and disputed its veracity. Doc. 56 at 12, n. 1. The Court cannot consider Defendants' assertions or evidence on appeal and must instead credit Plaintiffs'

Indeed, Defendants and the Plans themselves conceive of the single life annuity in the way that Plaintiffs do, *i.e.*, as describing a real person retiring in the present day. "[U]nmarried participants receive their benefits in the form of a SLA, which makes monthly payments to the participant from retirement until death." Doc. 53-1 at 9 (citation omitted); *see* Doc. 53-8 at 35-37, 39, 40 (§§ 4.2, 4.6, 4.7) (providing that a single life annuity is a monthly payment beginning at retirement and terminating upon "the Participant's death"); Doc. 53-3 at 34-35, 37-38 (§§ 4.2, 4.6, 4.7) (same). And the participant is "an Employee or former Employee who is included in the Plan." Doc. 53-8 at 20; Doc. 53-3 at 17. As such, the only way to produce the statutorily mandated "actuarial equivalent" of that SLA is to use similarly realistic (*i.e.*, current) actuarial assumptions.

### 2. Other ordinary statutory interpretation principles confirm that § 1055(d) obligates Defendants to use current assumptions when converting participants' SLAs to JSAs.

Because § 1055(d) requires the present value of participants' single life annuities to be determined by current actuarial assumptions, plan sponsors and fiduciaries will violate § 1055(d) if they use outdated actuarial assumptions when calculating JSA payments (*i.e.*, when converting SLAs to JSAs). This is because outdated assumptions will generate JSAs with a lower present value than real-life

---

plausible allegation that the QPSA charges are based on outdated assumptions. *E.g.*, *id*. at 12.

SLAs. In other words, if it turns out that the participant is married, the only way to provide a joint and survivor benefit equal to the "monthly payments to the participant from retirement until death" (Doc. 53-1 at 4 (citation omitted)) is to use, *e.g.*, present-day mortality tables.

The district court's "anything goes" interpretation effectively reads the "actuarial equivalence" requirement (§ 1055(d)(1)(B), § 1055(d)(2)(A)(ii)) out of the statute. Neither Defendants nor the district court articulated any limit on the assumptions plans can use. According to them, Defendants can use any mortality table they want, no matter how absurd the choice could be. "But it cannot possibly be the case that ERISA's actuarial equivalence requirements allow the use of unreasonable mortality assumptions. Taken to the extreme, the defendants' argument suggests that they could have used any mortality table—presumably, even one from the sixteenth century—to calculate the plaintiffs' JSAs. If this were true, the actuarial equivalence requirement would be rendered meaningless." *Urlaub*, 2022 WL 523129, at *6. Courts should reject interpretations that make statutory terms "insignificant, if not wholly superfluous." *Duncan v. Walker*, 533 U.S. 167, 174 (2001); *see, e.g.*, *TRW Inc. v. Andrews*, 534 U.S. 19, 29 (2001) (rejecting interpretation that "would in practical effect render [a provision] entirely superfluous in all but the most unusual circumstances"). The district court's failure to identify any limit on the assumptions that plan sponsors and fiduciaries may use to calculate

JSAs confirms the court's error—Congress did not enact a "meaningless" requirement in § 1055(d). *Cf. Price Waterhouse v. Hopkins*, 490 U.S. 228, 241 (1989) ("We need not leave our common sense at the doorstep when we interpret a statute.").

Aside from this surplusage problem, the practical effect of the district court's holding shows that it cannot reflect a straightforward, commonsense interpretation of § 1055(d). Congress did not enact the actuarial equivalence protection so that plans could ignore it. "Allowing plans to set their own definition of actuarial equivalence would eliminate any protections provided by that requirement." *Masten*, 543 F. Supp. 3d at 35; *see, e.g.*, *Esden*, 229 F.3d at 164 ("If plans were free to determine their own assumptions and methodology, they could effectively eviscerate the protections provided by ERISA's requirement of 'actuarial equivalence.'"); *Laurent v. PricewaterhouseCoopers LLP*, 794 F.3d 272, 286 (2d Cir. 2015) ("ERISA did not leave plans free to choose their own methodology for determining the actuarial equivalent of the accrued benefit."). The district court's approach results in joint and survivor annuities that are worth less than single life annuities, despite the statutory command of equivalence. In other words, Defendants would be permitted to pay a fraction of the participant's protected benefit—the present value of their single life annuity—instead of a benefit of equal value.

Further support for Plaintiffs' interpretation comes from parallel provisions of the Internal Revenue Code ("I.R.C."). The Treasury regulation interpreting the parallel to § 1055 (26 U.S.C. § 401) provides that "reasonable actuarial factors" must support actuarial equivalence: "A qualified joint and survivor annuity must be at least the actuarial equivalent of the normal form of life annuity or, if greater, of any optional form of life annuity offered under the plan. Equivalence may be determined, *on the basis of consistently applied reasonable actuarial factors*, for each participant or for all participants or reasonable groupings of participants, if such determination does not result in discrimination in favor of employees who are officers, shareholders, or highly compensated." Treas. Reg. § 1.401(a)-11(b)(2) (emphasis added).[7] That language was initially adopted in January 1977, shortly after ERISA's enactment. *See* Qualified Joint and Survivor Annuities, 42 Fed. Reg. 1463-02, 1466 (Jan. 7, 1977).

The district court pointed out that this regulation is not enforceable under ERISA (Doc. 62 at 17), but the I.R.C. and its regulations should not be brushed aside so easily. The I.R.C. works in conjunction with ERISA. And although the I.R.C. does not control whether there is an ERISA violation, it does control the critical question

---

[7] The language "on the basis of consistently applied reasonable actuarial factors" is offset by commas on both ends, indicating that the permissive word "may" in the phrase "Equivalence may be determined" does not refer to the use of "reasonable actuarial factors" but to the plan's option to group participants.

whether a plan maintains its tax-advantaged status. It makes little sense to interpret ERISA to allow plan sponsors and fiduciaries to act in a way that makes the retirement plan lose its favorable tax treatment. ERISA should be interpreted consistently with the I.R.C. and Treasury regulations.

In the face of these counterarguments, the district court rested its interpretation on the fact that Congress did not explicitly require "using assumptions that are reasonable or using specified interest rates and mortality tables." Doc. 62 at 16. That reasoning demands something close to magic words and takes too narrow a view of the statute. The court effectively ended its analysis once it couldn't find the specific word "reasonable" in the text. But the court should have examined the meaning of the words that Congress did use, not just the ones it didn't, and the court's conclusion is inconsistent with the plain meaning of § 1055(d).

The district court countered that other provisions do expressly use "reasonable" or "specific assumptions." Doc. 62 at 16 (citing 29 U.S.C. §§ 1393(a)(1), 1085a(c)(3)(A), and 1055(g)). In the court's view, those provisions show that "Congress knew how to require that plans determine actuarial equivalence using reasonable assumptions or calculate benefits using specific assumptions," so the absence of such an explicit requirement in § 1055(d) means that Congress must have intended that Defendants can do whatever they want. Doc. 62 at 16. That reasoning depends on the canon of statutory construction that "'[w]here Congress

includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *Russello v. United States*, 464 U.S. 16, 23 (1983) (citation omitted).

But "that canon supports 'only a presumption, and a rebuttable one at that' which 'must yield' to contrary textual evidence." *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1260 (11th Cir. 2020) (quoting *Hope v. Acorn Fin. Inc.*, 731 F.3d 1189, 1192-93 (11th Cir. 2013)).  And its force "grows weaker with each difference in the formulation of the provisions under inspection." *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 436 (2002). Courts, including this Court and the Supreme Court, thus regularly reject this presumption. *See, e.g.*, *Gateway Radiology*, 983 F.3d at 1260; *Hope*, 731 F.3d at 1193; *Tarrant Regional Water Dist. v. Herrmann*, 569 U.S. 614, 629-31 (2013); *Clay v. United States*, 537 U.S. 522, 529 (2003); *Children's Hosp. Ass'n of Tex. v. Azar*, 933 F.3d 764, 771-72 (D.C. Cir. 2019); *Henry Ford Health Sys. v. Dep't of Health & Hum. Servs.*, 654 F.3d 660, 666 (6th Cir. 2011); *United States v. Councilman*, 418 F.3d 67, 74 (1st Cir. 2005) ("If the statute's language, structure, or circumstances of enactment differ from that idealized picture, the canon's force is diminished. For example, if the language of the two provisions at issue is not parallel, then Congress may not have envisioned that the two provisions would be closely compared in

search of terms present in one and absent from the other."). The district court's reliance on other parts of ERISA fails for multiple reasons.

First and foremost, the best evidence of § 1055(d)'s meaning is § 1055(d)'s text, not different sections of Title 29. That text prevents using outdated actuarial assumptions, and the district court failed to engage with the words that Congress wrote in this provision. Any inference from other provisions cannot override § 1055(d)'s plain language. *See Russello*, 464 U.S. at 20 ("In determining the scope of a statute, we look first to its language. If the statutory language is unambiguous, in the absence of 'a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive.'") (quoting *United States v. Turkette*, 452 U.S. 576, 580 (1981)). Nor can comparisons to other statutory provisions justify the district court letting Defendants use unreasonable assumptions, thereby rendering the actuarial equivalent requirement meaningless and violating "[t]he cardinal principle of statutory construction." *United States v. Menasche*, 348 U.S. 528, 538 (1955).

Second, the provisions the district court invoked are too different in "language, structure, [and] circumstances" to draw meaningful conclusions for § 1055(d). *Councilman*, 418 F.3d at 74. Each of the other provisions targets "a specific problem" other than "converting single life annuities into alternative annuities." *Smith*, 438 F. Supp. 3d at 918 (comparing to lump-sum calculations).

Section 1055(g)(3) addresses lump sums, § 1085a addresses plan funding requirements, and § 1393(a)(1) addresses withdrawal liability. Those issues require distinct solutions with more or less specificity and rigidity. For instance, § 1055(g)(3) is less flexible than § 1055(d) in identifying a particular "applicable mortality table." 29 U.S.C. § 1055(g)(3)(A). Section 1393(a) gives the option of either "(1) actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations)" or "(2) actuarial assumptions and methods set forth in the corporation's regulations." 29 U.S.C. § 1393(a). And § 1085a(c)(3)(A) qualifies "reasonable[ness]" with "the experience of the plan and reasonable expectations" and "the actuary's best estimate of anticipated experience under the plan." 29 U.S.C. § 1085a(c)(3)(A) and (B). Moreover, none of those sections uses the language "actuarial equivalent" or "for the life of the participant." *See Adams*, 635 F. Supp. 3d at 753. These three sections thus bear little resemblance to the provision at issue here.

And that different language should be unsurprising given the different topics of those provisions and their different enactments. Whereas § 1055(d)'s language appeared in the original version of ERISA (*see* Employee Retirement Income Security Act of 1974, Pub. L. No. 93-406, Sec. 205(g)(3), 88 Stat. 829, 863), each provision the district court cited came from later laws. *See* Pension Protection Act

of 2006, Pub. L. No. 109-280, Secs. 202 & 302, 120 Stat. 780, 868, 872, 920 (adding § 1055(g)(3)); Multiemployer Pension Plan Amendments Act of 1980, Pub. L. No. 96-364, Sec. 104, 94 Stat. 1208, 1233 (adding § 1393(a)(1)); Cooperative and Small Employer Charity Pension Flexibility Act, Pub. L. No. 113-97 (2014), Sec. 102, 128 Stat. 1101, 1105 (adding § 1085a(c)(3)(A)). The district court thus "read too much into Congressional inaction." *Smith*, 438 F. Supp. 3d at 918.

Finally, inferences from other provisions in favor of Plaintiffs' view are at least as strong. The district court held that § 1055(d) is satisfied by following whatever is written down in the plan. Doc. 62 at 18. But when Congress wanted to, it knew how to specify that a benefit "determined under the plan" controlled. 29 U.S.C. § 1002(23)(A); *see, e.g.*, 29 U.S.C. § 1002(22) ("The term 'normal retirement benefit' means the greater of the early retirement benefit under the plan, or the benefit under the plan commencing at normal retirement age.").

And the court's interpretation of § 1055(d) accomplishes nothing more than what is already required by 26 U.S.C. § 401(a)(25). Section 401(a)(25) provides (in relevant part) that, "whenever the amount of any benefit is to be determined on the basis of actuarial assumptions, such assumptions [must be] specified in the plan." 26 U.S.C. § 401(a)(25). If all that is required for § 1055(d)'s actuarial equivalence requirement is listing the assumptions used in the plan document—*i.e.*, if it is merely a disclosure requirement, rather than one that mandates substantive equality between

JSAs and SLAs—then § 1055(d) is superfluous in light of § 401(a)(25). Plaintiffs' interpretation of § 1055(d) allows both provisions to have meaning.

### 3. The district court's holding guts the central purpose of § 1055.

Allowing Defendants to use outdated mortality tables also must be wrong because it would frustrate the structure and purpose of § 1055 by penalizing married participants or incentivizing them to opt out of the joint-and-survivor default. An unmarried participant, retiring today, will receive a certain monthly payment for the rest of her life. The expected aggregate value of those payments is based on present-day assumptions. But when Defendants calculate the present value of that income stream for purposes of creating the joint and survivor annuity, instead of using present-day mortality tables, they use decades-old ones. Due to the increase in life expectancies, the joint and survivor annuity ends up being less valuable than it should be had Defendants followed ERISA and calculated a value that is actuarially equivalent to the single life annuity the participant would receive as a default if the participant were single. As a result, a married participant is penalized unless they opt out of the joint and survivor annuity.

That opt-out solution is problematic for two separate reasons. One, the joint and survivor annuity is provided as a strong default, waivable only with the spouse's written consent. 29 U.S.C. § 1055(c)(2). Participants may not make this effort, particularly because they are unlikely to realize that they are being shortchanged.

Two, as the Supreme Court explained, "[t]he statutory object of the qualified joint and survivor annuity provisions, along with the rest of § 1055, is to ensure a stream of income to surviving spouses." *Boggs*, 520 U.S. at 843. Congress designed § 1055 to "correct" the "hardship where an individual primarily dependent on his pension as a source of retirement income is unable to make adequate provision for his spouse's retirement years." S. Rep. 93-383, available at 1974 U.S.C.C.A.N. 4889, 5029 (1973). Defendants' outdated mortality tables frustrate that objective. They "force" married participants "to choose between (1) more valuable types of pension benefits—*e.g.*, SLAs and lump-sum payments—that might leave their spouses and children penniless were they to die, or (2) JSAs that were worth less." *Urlaub*, 2022 WL 523129, at *5 (cleaned up). Requiring plans to use current actuarial assumptions puts married and unmarried participants on equal footing and protects "the economic security of surviving spouses." *Boggs*, 520 U.S. at 843. Thus, the district court's contrary decision cannot be squared with ERISA's purpose.

Defendants asserted below that retirees are nevertheless protected from unreasonable assumptions because those assumptions must be written in the plan document. Doc. 58 at 10-11. This argument does not support the conclusion Defendants draw from it—simply identifying an unreasonable assumption in the plan does not protect a participant from receiving a joint and survivor annuity that is less valuable than their single life annuity. Defendants' entire argument is that

41

ERISA permits the plan document to identify any actuarial assumptions that plan sponsors and fiduciaries choose. That's no protection at all.

Adhering to § 1055's plain text and purpose, the vast majority of courts from around the country have recognized that the only way to give meaning to § 1055 is to require reasonable assumptions and prohibit plans from calculating actuarial equivalence using any assumptions they fancy. *See, e.g.*, *Paieri*, 2024 WL 3455269, at *10; *Franklin*, 2024 WL 1740479, at *3; *Hamrick*, 2024 WL 359240, at *4; *Urlaub*, 2022 WL 523129, at *6; *Masten*, 543 F. Supp. 3d at 33-36; *Duffy*, 449 F. Supp. at 887-92; *Herndon*, 2020 WL 3053465, at *2 ("Defendants must use 'reasonable' data to ensure that Plaintiff is receiving benefits that are equivalent to a single life annuity."); *Cruz*, 435 F. Supp. 3d at 353 (denying motion to dismiss plaintiff's challenge to joint and survivor annuity calculation based on 0.90 conversion factor because plaintiff "plausibly alleges that the [plan] violates ERISA by relying upon unreasonable actuarial assumptions"); *Smith*, 438 F. Supp. 3d at 916 (rejecting defendants' argument that "Congress could not have intended to require that plans periodically review their actuarial assumptions to ensure that they are reasonable at the time benefit calculations are made"); *see also Scott*, 2022 WL 2342645, at *1 (permitting (a)(2) claim based on similar allegations to proceed); *Torres*, 416 F. Supp. 3d at 650 ("At this juncture, the Court concludes that Plaintiffs have alleged a plausible claim that by using the UP-1984 mortality table to convert

the amount of an SLA into an alternate form of benefit (such as a QJSA, QOSA, or a QPSA), assuming a 5% interest rate, Defendants fail to provide the participants and beneficiaries of the Plans with an actuarially equivalent benefit in violation of ERISA."). The district court's decision is only one of a few outliers. *See Belknap v. Partners Healthcare Sys., Inc.*, 588 F. Supp. 3d 161 (D. Mass. 2022); Op. & Order Granting Motion to Dismiss, *Reichert v. Bakery, Confectionary, Tobacco Workers & Grain Millers Pension Committee*, No. 2:23-cv-12343 (E.D. Mich. Apr. 17, 2024), ECF No. 36 (conceding that the logical outcome of its decision is that "the actuarial equivalence requirement would be rendered meaningless"), *appeal filed*, *Reichert v. Kellogg Co.*, No. 24-1442 (6th Cir.). Its judgment should be reversed.

## II. Using outdated mortality assumptions to calculate a JSA violates ERISA's nonforfeiture provision because reducing the total value of the benefit to which a participant is entitled constitutes a forfeiture.

The district court also erred in dismissing Odom's claim that Defendants' JSA conversion effected a forfeiture of his "right to his normal retirement benefit" in violation of 29 U.S.C. § 1053(a).[8] A participant states a claim under that section by "plausibly alleg[ing] that the actuarial assumptions reduced [his] benefits as compared to the Plan's default benefit." *Masten*, 543 F. Supp. 3d at 36. Odom did so: He alleged that under his Plan he was entitled to a certain normal retirement

---

[8] This claim, like the one discussed in Part I, is brought only by Odom on his and the JSA Class's behalf.

benefit (his single life annuity), but that Defendants' use of outdated actuarial assumptions left him with a less valuable benefit. That constitutes a paradigmatic forfeiture in violation of § 1053.

Section 1053(a) guarantees that "an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age." 29 U.S.C. § 1053(a). ERISA defines "normal retirement benefit" as "the greater of the early retirement benefit under the plan, or the benefit under the plan commencing at normal retirement age." 29 U.S.C. § 1002(22). And "nonforfeitable" means "a claim obtained by a participant or his beneficiary to that part of an immediate or deferred benefit under a pension plan which arises from the participant's service, which is unconditional, and which is legally enforceable against the plan." 29 U.S.C. § 1002(19). The upshot is that once a participant reaches normal retirement age and has an unconditional right under the plan to the plan's normal retirement benefit, then the plan cannot provide a benefit of lesser value—because the participant has an unconditional right to 100% of his benefit amount.

Defendants cannot dispute that Odom had an unconditional right to 100% of his normal retirement benefit under the Plan. Odom alleged that he "became vested and accrued benefits in the Plan, and left employment with the company upon retirement at age 65." Doc. 51 at 9 (¶ 19). He was thus "entitled under the Plan to a single life annuity for his life of $3588.65/month." Doc. 51 at 24-25 (¶ 60). The Plan

44

is unambiguous on this front. Section 4.1(a) provides that "[e]ach Participant in the Plan" has "a nonforfeitable right to his Retirement Income by no later than his sixty-fifth (65th) birthday." Doc. 53-8 at 42. "Retirement Income . . . is described in Section 4.2(a) or (b) of the Plan, as applicable." Doc. 53-8 at 42. And Section 4.2 is titled "Normal Retirement Income" and provides for monthly income "payable as a single life annuity." Doc. 53-8 at 43.

Accordingly, Odom had a vested right to the SLA specified in Section 4.2 of the Plan. While Odom may take his benefit in another form—like a JSA—§ 1053 requires that that other form be at least as valuable as the vested single life annuity under the Plan. That is because "otherwise the value of the pension is lower than one that begins on the normal retirement date, and a reduction in the total value of all monthly benefits is a kind of forfeiture." *Contilli*, 559 F.3d at 722.

Given that this is a motion to dismiss, those straightforward principles combined with the Plan's language should make this a simple issue. Odom alleged that Defendants' actuarial conversion resulted in an annuity whose "total value" has been "reduc[ed]." *Id.*; Doc. 51 at 24-25 (¶ 60). That plausible factual allegation must be taken as true. As such, Odom has alleged a violation of § 1053(a): Under the Plan's terms, Odom had a vested right to a certain amount of monthly income in the form of a single life annuity; that annuity was his "normal retirement benefit"; when the plan converted that annuity into a joint and survivor annuity, it created an annuity

45

that was less valuable than his normal retirement benefit; that "reduction in the total value of" his normal benefit "is a kind of forfeiture." *Contilli*, 559 F.3d at 722.

Were there any doubt on this score, the Treasury regulations would remove it. They provide: "Certain adjustments to plan benefits such as adjustments in excess of reasonable actuarial reductions, can result in rights being forfeitable." 26 C.F.R. § 1.411(a)-4(a); *see* 29 U.S.C. § 1202(c) (providing that this regulation applies to ERISA). That is exactly what Odom alleges happened here.[9]

Other courts have used identical reasoning to deny motions to dismiss similar claims. *See, e.g.*, *Masten*, 543 F. Supp. 3d at 36 ("To state [a] claim under [29 U.S.C. § 1053], Plaintiffs must therefore plausibly allege that the actuarial assumptions reduced their benefits as compared to the Plan's default benefit.") (citing *Contilli* and § 1.411(a)-4(a)); *Torres*, 416 F. Supp. 3d at 650 ("Improper actuarial adjustments that reduce a pension's value is a forfeiture under ERISA § 203.").

The district court's contrary conclusion misunderstood § 1053(a)'s scope and the Supreme Court's decision in *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504 (1981). The court quoted *Alessi*'s statement that § 1053 "does not guarantee a

---

[9] Odom raised this precise argument before the district court: "[E]xcessive actuarial reductions that eliminate 'the level of benefits' that Plaintiffs are otherwise entitled to under the Plan are indeed forfeitures, which are prohibited under § 1053. Nothing in *Alessi* says otherwise. . . . Thus, when the Plan reduced his normal retirement benefit of $3589/month to a JSA of $2899/month (which is less than actuarially equivalent in value), a forfeiture occurred." Doc. 56 at 18 (citing Doc. 51 at 24-25 (¶ 60)).

particular amount or a method for calculating the benefit." Doc. 62 at 21 (quoting 451 U.S. at 512). The court then concluded: "Plaintiffs['] JSA benefits vested under the terms of the Plan, and absent an allegation that the Plan's terms were not followed in calculating benefits payments, in view of *Alessi*, Plaintiffs cannot state a claim for forfeiture based on the Plan's alleged use of unreasonable actuarial assumptions in calculating Odom's JSA benefits (Count II) . . . ." Doc. 62 at 21.

But *Alessi* did not place every plan benefit calculation outside ERISA's constraints. The Supreme Court was discussing, consistent with § 1053(a)'s plain language, only the guarantee of a "normal retirement benefit." *See* 451 U.S. at 510-11 ("Most critically, ERISA establishes that '[e]ach pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age.'") (quoting 29 U.S.C. § 1053 (a)). That is, plan sponsors may be generally free to set the normal retirement benefit and the terms under which it vests. But after they make those decisions, ERISA limits further flexibility. *See, e.g.*, *Esden*, 229 F.3d at 173 ("The Plan is correct that a pension benefit is defined according to the terms of the plan; but ERISA is quite explicit that those terms are circumscribed by statutory requirements and restrictions. The Plan cannot contract around the statute."). One such restriction is that once a participant vests in that normal retirement benefit, § 1053(a) forbids the plan to reduce its value. It thus does not matter that Odom's Plan wrote down the actuarial assumptions for

*converting* the normal retirement benefit. The Plan may get to pick the normal retirement benefit, but ERISA then guarantees that value as a minimum for any conversion. *Cf. Esden*, 229 F.3d at 173 ("The statutes nowhere provide for an exception allowing a plan to offer an employee the voluntary choice of a partial forfeiture in exchange for a particular form of payment."). Odom plausibly alleges that Defendants violated that minimum.

Moreover, the district court entirely ignored the effect of 26 C.F.R. § 1.411(a)-4(a). The court acknowledged that Odom invoked that regulation and even acknowledged that this regulation does "apply to the portions of ERISA that are relevant here." Doc. 62 at 19 & n.12. But then the court never mentioned it again. *See id.* at 20-21. Congress expressly instructed that Treasury regulations govern § 1053. *See* 29 U.S.C. § 1202(c). Although this regulation is unnecessary for reversal given the plain text of § 1053(a), Congress's judgment must be respected, and the regulation thus provides another reason for reversal on this claim.

## III. Using outdated mortality assumptions also violates ERISA by overinflating the QPSA charge.

Plaintiffs' claim based on Defendants' excessive QPSA charges should also go forward. A QPSA is like life insurance—whereas a JSA starts paying once the working spouse retires, a QPSA pays in situations where the working spouse dies before retirement. The QPSA charge is then like a life insurance premium—it reflects the cost to the plan of paying out in the event of the working spouse's death.

48

Most plans do not impose a QPSA charge. Doc. 51 at 33 (¶ 83). And while ERISA allows plans to impose a QPSA charge (29 U.S.C. § 1055(i)), both sides agreed in the district court that the charge must "'reasonably reflect[] the cost of providing the QPSA.'" Doc. 58 at 14-15 (quoting Doc. 56 at 11, 19). Treasury regulations, which § 1055(i) incorporates, make that standard clear: "A charge for the QPSA that reasonably reflects the cost of providing the QPSA will not fail to satisfy [I.R.C.] section 411 even if it reduces the accrued benefit." 26 C.F.R. § 1.401(a)-20 Q/A 21; *see* 29 U.S.C. § 1055(i) (authorizing QPSA charge "as determined by the Secretary of the Treasury"); *see also* 26 C.F.R. § 1.411(a)-4(a). An unreasonably high QPSA charge violates § 1055(i) and, where (as here) that unreasonable QPSA charge is applied to reduce the accrued benefit, it violates § 1053 also.[10]

Plaintiffs plausibly alleged that Defendants' QPSA charges are unreasonably high. Defendants used their same decades-old mortality assumptions here, which overestimated the likelihood of Plaintiffs dying in any given year and thus overestimated the cost of the QPSA. *See* Doc. 51 at 33-35 (¶¶ 85-91). By contrast, reasonably current assumptions realistically estimate the chance of death and would have produced a significantly lower charge. Doc. 51 at 34-35 (¶¶ 87, 89).

---

[10] A violation of § 1055(i) is independently actionable, but Plaintiffs plausibly alleged that the unreasonable QPSA charge reduced their accrued benefits (*i.e.*, their single life annuities). Plaintiffs thus stated a claim under both § 1055(i) and § 1053.

Accordingly, Defendants' use of outdated assumptions violated ERISA's allowance for QPSA charges.

The district court rejected this claim for two reasons, neither of which was offered by Defendants and both of which are wrong. First, the court thought that 26 C.F.R. § 1.401(a)-20 Q/A 21 does not control § 1055(i). *See* Doc. 62 at 20 ("[T]he Court is not persuaded that § 1.401(a)-20 Q/A-21 was promulgated pursuant to § 1055(i)."). But § 1055(i) explicitly invokes Treasury guidance, allowing QPSA charges "as determined by the Secretary of the Treasury." 29 U.S.C. § 1055(i). In turn, the regulation specifically invokes I.R.C. § 417, *see* 26 C.F.R. § 1.401(a)-20 Q/A 1, and I.R.C. § 417(f)(4) is the identical parallel provision to § 1055(i), *compare* § 417(f)(4) *with* § 1055(i).

Regardless, even without the regulation, § 1055(i) unambiguously limits QPSA charges to "any increased costs resulting from providing" the QPSA. Plans cannot pick any QPSA charge out of thin air; rather, it must reflect the actual "costs resulting from providing" the QPSA. 29 U.S.C. § 1055(i). And again, Plaintiffs alleged that Defendants have overestimated those costs by using outdated mortality assumptions.

The district court's second error was to misread the regulation. The court wrote that the regulation "does not reflect a determination by the Secretary of the Treasury that only those QPSA charges that *reasonably* reflect the cost of providing

50

a QPSA are allowable." Doc. 62 at 20 (emphasis in original). This is not a plausible understanding of the regulation (or the statute). There would be no point in the Treasury regulation approving reasonable charges if unreasonable charges are also acceptable. Moreover, as with Plaintiffs' arguments regarding § 1055(d), the court's blessing of *un*reasonable QPSA charges defies the statutory and regulatory text, the statute's purpose, and common sense. There is a good reason that Defendants did not resist Plaintiffs' argument that the charge must be reasonable. *See* Doc. 58 at 14-15.

Defendants did make another argument, which the district court did not adopt. While acknowledging that the QPSA charge must be reasonable and reflect the actual cost of providing the QPSA, they asserted that Plaintiffs' factual allegations are "*ipse dixit*" and fail the plausibility standard. Doc. 58 at 15. There is a good reason the district court did not so hold. Plaintiffs explained that the cost of a QPSA depends on the likelihood of the working spouse passing away and that Defendants are overestimating that probability by using decades-old assumptions, and Plaintiffs further explained the exact cost that would be reasonable. *See* Doc. 51 at 33-35 (¶¶ 85-91). Nothing more is required at this stage. Defendants complained that Plaintiffs' allegations lack a "source or authority" for these estimates (Doc. 58 at 15), but Plaintiffs need not proffer expert statistical testimony at this time. *See Pledger v. Lynch*, 5 F.4th 511, 520 (4th Cir. 2021) ("Plaintiffs need not gather any expert evidence or serve it on defendants for a claim to be plausible.") (cleaned up).

Finally, the same statutory purpose discussed above about protecting "the economic security of surviving spouses" (*Boggs*, 520 U.S. at 843) again supports Plaintiffs' QPSA claim. Allowing plans to impose any QPSA charge they want, as long as it's written in the plan, either incentivizes participants to waive QPSA coverage or reduces the amount of the benefit provided to the surviving spouse. *See supra* Part I.B.3. Both options contravene § 1055's goals as articulated by the Supreme Court.

At bottom, this claim is simple: The legal standard is a reasonable QPSA charge (or one that reflects the actual cost of providing the QPSA), and Plaintiffs alleged that using decades-old mortality assumptions inflate the QPSA charge beyond what is reasonable (and the QPSA's actual cost). Perhaps expert discovery will show that Plaintiffs are wrong, but for now they have stated a claim under § 1055(i) and § 1053. The court's contrary decision should be reversed.

\* \* \*

In sum, Defendants violated 29 U.S.C. §§ 1053 and 1055 when converting participants' SLAs to JSAs and when imposing QPSA charges on participants' SLAs. The district court thus erred in dismissing Counts I, II, and III of the second amended complaint. And because the district court's sole basis for dismissing the fiduciary breach claim was that "Plaintiffs failed to plead an ERISA violation under § 1055 or § 1053," Doc. 62 at 22 (cleaned up), it was also error to dismiss Count IV.

52

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's order dismissing Plaintiffs' complaint and remand for further proceedings.

Dated:  November 27, 2024

Respectfully submitted,

**STRIS & MAHER LLP**

*/s/ Rachana Pathak*
Rachana Pathak

*Attorney for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

Undersigned counsel certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12607 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and 11th Cir. R. 32-4.

Undersigned counsel certifies that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionately spaced 14-point Times New Roman typeface using Microsoft Word for Microsoft 365 MSO.

Dated:  November 27, 2024           Respectfully submitted,

**STRIS & MAHER LLP**

*/s/ Rachana Pathak*
Rachana Pathak

*Attorney for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notifications of such filing to all attorneys of record.

Dated:  November 27, 2024                    Respectfully submitted,

**STRIS & MAHER LLP**

*/s/ Rachana Pathak*
Rachana Pathak

*Attorney for Plaintiffs-Appellants*

55